UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2010 APR 23 AM 10: 28

BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA, )
    Plaintiff, )
)
v. ) Case No. 5:09-CR-81
)
PETER KISGYORGY, )
    Defendant. )

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

This matter came before the court on April 25, 2010 for an evidentiary hearing on Defendant Peter Kisgyorgy's Motion to Suppress. The Defendant is represented by Michael Desautels, Esq. The Government is represented by Assistant United States Attorney Nancy Creswell. The Defendant seeks suppression of all evidence, including evidence of his identity, derived from his detention and subsequent arrest on July 14, 2009. The Government opposes that request.

The Defendant is charged with one count of violating 8 U.S.C. § 1326(c) for being found in the United States, without consent of the U.S. Attorney General, after having previously been removed on November 2, 1998 and May 15, 2009, and after having been convicted of Theft in San Diego, California on or about July 6, 1998.

### Findings of Fact

Based upon the admissible evidence, the court makes the following findings of fact. On July 14, 2009, at approximately 1215 hours, U.S. Border Patrol agents received a citizen's report of a "suspicious" individual at the Franklin General Store (the "Store"). The individual was described as a male wearing camouflage pants and a brimmed hat and carrying a large backpack. The person was described as having a dark complexion, an accent, and was possibly South American. It was further reported that the person was trying to call a taxi.

Border Patrol Agent, Richard Ross,[1] responded to the dispatch and proceeded to the Store. At the time, he was in uniform, had a holstered firearm, and was operating an unmarked Ford 150 truck with a canine in it.

The Store is located on Route 120 in Franklin, Vermont and is approximately two miles from the Canadian border. There is generally no cell phone service in the area and the Store has a public telephone. Prior to the incident in question, Agent Ross had encountered approximately seven individuals who had crossed the border illegally and entered the Store to use the telephone. He is aware of other officers in his agency who have also had this experience. The Store is located in an area of Vermont where individuals with no immigration authority often try to enter the United States.

At approximately 1235 hours, Agent Ross arrived at the Store and parked outside. He entered the Store, walking past the Defendant to the back of the Store where Bill Mayo, the person who made the initial report, was standing. Mr. Mayo pointed to the Defendant.

Agent Ross turned around and approached the Defendant, introducing himself as a Border Patrol agent. He "very casually" asked the Defendant how he was doing. This approach was consistent with Agent Ross's training that field interviews should remain consensual as long as possible and a casual, non-intimidating, conversational approach and tone of voice should be used.

Agent Ross asked the Defendant where he was coming from. The Defendant said he had been camping. Agent Ross noticed that the Defendant's clothes were wet and muddy and that he had a large backpack with him. Agent Ross was aware of two campgrounds in the area, both of which had public telephones and cleared camping sites.

---

[1] Agent Ross is a supervisory U.S. Border Patrol agent stationed at the Richford, Vermont border station. He has been a Border Patrol agent for eleven years and has interviewed "a thousand or better" illegal aliens. He has encountered individuals who are in the country illegally who nonetheless possess United States driver's licenses. He has also encountered individuals who carry their naturalization papers with them.

2

Notwithstanding the fact that it had been raining, the Defendant's appearance suggested to Agent Ross that the Defendant may have just come through the woods from Canada as his clothes were muddier than Agent Ross believed consistent with camping. Agent Ross did not ask the Defendant where he had been camping and did not call nearby campgrounds to verify whether the Defendant had camped there.

Agent Ross asked the Defendant: "Do you mind stepping outside with me so that I can talk to you?" The Defendant followed Agent Ross outside. They stood on the concrete steps in front of the Store under a covered, unenclosed porch close to ground level. Agent Ross did not block the Defendant's exit or touch him in any manner.

Agent Ross asked the Defendant where he was from and the Defendant said he was from California. Agent Ross asked the Defendant where he was born and the Defendant told him "Hungary." Agent Ross asked for identification and the Defendant produced a California driver's license. Agent Ross did not accept this identification as proof of U.S. citizenship pursuant to his agency's policy. Agent Ross asked the Defendant when he was born, and if he had any immigration documents with him. The Defendant responded that he was a naturalized citizen. He asked the Defendant when he was naturalized, where he was naturalized, and how he was naturalized. The Defendant did not respond to any of these questions. Agent Ross found this suspicious because naturalization is a time-consuming process and, in his experience, is generally considered a big event in a person's life, "like a holiday," such that a person would know when, how, and where it happened.[2]

Agent Ross described the Defendant's demeanor throughout the encounter as "very calm" which Agent Ross found odd because, in his experience, people generally ask why they are being questioned. He testified that the Defendant's calm demeanor

---

[2] Agent Ross did not record this aspect of the conversation in his I-213 report even though he acknowledges it was a significant factor in his decision-making.

indicated to him that the Defendant may have had prior encounters with law enforcement.

A taxi arrived at the Store to pick up the Defendant. Agent Ross told the taxi driver in the Defendant's presence: "He's not free to go with you right now." He further explained that if there was a fee to be collected, that was between the taxi driver and the Defendant. He did not ask the taxi driver the Defendant's intended destination. The taxi driver became angry and drove off. At the time of the taxi's arrival, Agent Ross had possession of the Defendant's driver's license.

Agent Ross asked the Defendant if he minded stepping back into the Store with him so that he could make a phone call. The Defendant walked back into the Store, near its entrance, and waited while Agent Ross called his dispatch for a record check by name and date of birth. Agent Ross reported to dispatch that the individual was claiming to be a naturalized citizen–a fact that, if true, would show up in a records check. Agent Ross maintained possession of the Defendant's driver's license while he made this call. Dispatch reported that the individual had an "extensive criminal record" and had previously been deported. Dispatch did not confirm whether the Defendant was a naturalized citizen and Agent Ross did not inquire further. After the phone call concluded, Agent Ross asked the Defendant whether he minded stepping outside again.

The Defendant followed Agent Ross outside where he was placed under arrest. Agent Ross considered this to be an "administrative arrest" based upon an immigration violation, although he acknowledged that he understood it was a crime for an alien to re-enter the country without permission after removal. Agent Ross's entire encounter with the Defendant at the Store lasted approximately twenty-one minutes.

Agent Sean McVey, the Border Patrol agent in charge of the Richford station, arrived on the scene to transport the Defendant to the station.[3] When he arrived, the Defendant was sitting on the stoop in front of the Store. Agent McVey handcuffed the

---

[3] Agent Ross could not transport the Defendant because of the canine in his vehicle.

Defendant and, in the patrol car, restrained him with a seatbelt. He advised the Defendant that there was no cage in the vehicle and therefore he needed to behave appropriately during the trip. He also told the Defendant that there was no reason for the two of them to speak en route, and they did not do so.

At the station, the Defendant was processed and his fingerprints were taken on an Integrated Automated Fingerprint Identification System ("IAFIS") to verify his identity. The Defendant was asked standard "booking" questions such as his name, date of birth, country of birth, country of residence, marital status, and whether he had any children. In a matter of minutes, IAFIS gave a "positive" report that the Defendant was Peter Kisgyorgy, that he had been deported in May of 2009, and that he had been deported prior to that. The Defendant was placed in a holding cell.

At 1330 hours, Agent Ross administered *Miranda* warnings to the Defendant, reading from a pre-printed card. Agents Masada and McVey were present when he did so. The Defendant orally waived his *Miranda* rights and stated that he was willing to answer questions without an attorney present.

Agent McVey subsequently reminded the Defendant of each of his *Miranda* rights, using an I-215(b) form and recording the Defendant's answers. The Defendant signed page 2 and initialed page 1 of the form. Agent McVey did not ask the Defendant about his eyesight although he recalled the Defendant had eyeglasses with him. He did not recall whether the Defendant was wearing his glasses when he signed the form. The Defendant did not advise Agent McVey that he could not read the form. Agent McVey proceeded to ask the Defendant the following questions:

> **McVey:** Do you wish to have a lawyer or any other person present to advise you?
>
> **Defendant:** No.
>
> **McVey:** Are you willing to answer any questions at this time?

**Defendant**: Yes.

**McVey**: Do you swear that all the statements you are about to make will be the truth, the whole truth and nothing but the truth so help you God?

**Defendant**: Yes.

**McVey**: What is your true and correct name?

**Defendant**: Peter Kisgyorgy.

**McVey**: Have you used any other names?

**Defendant**: No.

**McVey**: Of what country are you a citizen?

**Defendant**: Hungary.

**McVey**: What is your date and place of birth?

**Defendant**: Budapest, Hungary.

**McVey**: When did you last enter the United States?

**Defendant**: Three months ago I entered the United States through the San Ysidro port of entry.

At this point, Agent McVey believed the Defendant was being untruthful as border patrol records revealed that, in May of 2009, the Defendant was removed from the United States and returned to Hungary. Agent McVey asked, "How is that possible since you were in custody at the time?" The Defendant responded: "I do not want to answer any more questions." The interview was terminated.

Thereafter, the matter was forwarded to the United States Attorney's Office to determine whether the Defendant would be the subject of a criminal prosecution. This criminal proceeding was commenced thereafter.

## Conclusions of Law and Analysis

The Defendant seeks suppression of his name, identity (including fingerprints), his immigration history, his criminal history, his statements, and his property that was seized on the grounds that this evidence was obtained in violation of his constitutional rights. In particular, he asserts that Agent Ross lacked a reasonable suspicion to detain him at the Store and thereafter lacked probable cause to arrest him. He further asserts that he did not knowingly and voluntarily waive his right to have counsel present at his questioning. He contends that all evidence seized from him was the tainted fruit of a constitutional violation. (Doc. 18 at 3-8.)

The Government opposes suppression, arguing that the initial detention and arrest of the Defendant were administrative in nature and thus not subject to Fourth Amendment protections. (Doc. 21 at 8-12, 15-18.) Moreover, even if the Fourth Amendment is deemed to apply, the Government asserts that the Defendant's detention at the Store was based upon a reasonable suspicion of criminal activity that ripened into probable cause to arrest. The Government further contends that the Defendant validly waived his *Miranda* rights and that, in any event, his identity is not subject to suppression. (Doc. 21 at 18-22.)

*A. Whether the Defendant's Detention was Administrative in Nature.*

The Government contends that the Defendant's detention was administrative in nature and thus not subject to Fourth Amendment protections. In *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1046 (1984), the United States Supreme Court held that a Fourth Amendment violation does not, by itself, require application of the exclusionary rule and suppression of evidence in a civil removal proceeding. However, the Court "qualified this ruling in two significant ways." *Melnitsenko v. Mukasey*, 517 F.3d 42, 47 (2d Cir. 2008):

> First, it stated that its "conclusions concerning the exclusionary rule's value might change, if there developed good reason to believe that Fourth Amendment violations by [immigration] officers were widespread." And, second, it explained that its holding did not necessarily pertain to

circumstances involving "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained."

*Id.* (quoting *Almeida-Amaral v. Gonzales*, 461 F.3d 231, 234 (2d Cir. 2006) (internal citations omitted)).

"A removal proceeding . . . is 'a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime.'" *Pinto-Montoya v. Mukasey*, 540 F.3d 126, 130 (2d Cir. 2008) (quoting *Lopez-Mendoza*, 468 U.S. at 1038). Such a proceeding "looks prospectively to the respondent's right to remain in this country in the future. Past conduct is relevant only insofar as it may shed light on the respondent's right to remain." *Lopez-Mendoza*, 468 U.S. at 1038.

The present case is not a civil removal proceeding. Accordingly, the court analyzes Agent Ross's detention and arrest of the Defendant in accordance with Fourth Amendment standards. *See United States v. Tehrani*, 826 F.Supp. 789 (D.Vt. 1993), *aff'd*, 49 F.3d 54 (2d Cir. 1995) (criminal prosecution arising out of an administrative arrest triggers Fourth Amendment analysis of defendant's detention and arrest).

B. *Whether the Defendant's Detention at the Store was Lawful.*

The primary question is whether Agent Ross's detention of the Defendant at the Store was lawful. If it was not, the evidence obtained as a product of an unlawful detention may be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963). Of course, "[n]ot every encounter between a police officer and an individual is a seizure implicating the fourth amendment's protections." *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990). A consensual encounter does not trigger Fourth Amendment scrutiny. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991). Accordingly, "[e]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's

identification, and request consent to search his or her luggage--as long as the police do not convey a message that compliance with their requests is required." *Id.* at 434-35 (internal citations omitted). Here, the analysis begins with an examination of whether Agent Ross's encounter with the Defendant at the Store was consensual and, if so, for how long it retained this characteristic.

Agent Ross initially approached the Defendant in the Store, identified himself as a border patrol agent, and sought and obtained the Defendant's agreement to speak in a more private location. *See Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984) ("The initial contact between the officers and respondent, where they simply asked if he would step aside and talk with them, was clearly the sort of consensual encounter that implicates no Fourth Amendment interest"); *see also* 8 U.S.C. § 1357(a)(1) (authorizing border patrol agents to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States"). The Defendant then voluntarily followed Agent Ross to the stoop in front of the Store which was open to the public. Defendant's compliance with Agent Ross's request was not in response to a show of force, a physical touching, or any effort to restrain the Defendant's movements.

Agent Ross used a conversational, non-intimidating tone of voice and phrased his inquiries as questions rather than as orders. *See Muehler v. Mena*, 544 U.S. 93, 101 (2005) ("Mere police questioning does not constitute a seizure.") (quotation marks and citation omitted); *United States v. Drayton*, 536 U.S. 194, 200 (2002) ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen.").

The Defendant told Agent Ross that he had been camping. Agent Ross asked the Defendant if he had any identification and the Defendant provided a California driver's license. *See Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion) (law enforcement officers' identification of themselves and request for individuals'

9

identifications was not a seizure); *United States v. Glover*, 957 F.2d 1004, 1009 (2d Cir. 1992) (no seizure found during initial police questioning that took place in public place where defendant was asked in non-threatening manner about his travel and identification).

When questioned further, the Defendant stated that he was born in Hungary and claimed to be a "naturalized citizen." In response to a request for immigration documents, he advised that he did not have his naturalization papers with him. *See Ojeda-Vinales v. INS*, 523 F.2d 286, 288 (2d Cir. 1975) ("Petitioner's failure to produce identification which might have established the legality of his [presence] could have been taken by the agents as further indication that he was in violation of the immigration laws."). He declined or was unable to provide any information regarding how, when, and where he was naturalized. The Defendant's unwillingness to provide this information undercuts any claim that he felt compelled to answer Agent Ross's questions as a condition precedent to his leaving. *See INS v. Delgado*, 466 U.S. 210, 216 (1984) (in determining whether law enforcement questioning constitutes a seizure, court must ask whether "a reasonable person would have believed he was not free to leave" if he did not respond to the questions put to him); *see also United States v. Saladino*, 2009 WL 1882833 *5 (D.Or. 2009) (finding no coercion of suspect who "felt free to decline to answer any questions as indicated by his refusal to do so on two occasions."). At this point, the encounter between Agent Ross and the Defendant was wholly consensual in nature. "Such contact may be initiated by the police without any objective level of suspicion and does not, without more, amount to a seizure, implicating the Fourth Amendment's protections." *Glover*, 957 F.2d at 1008.

When the taxi arrived, Agent Ross, a uniformed officer with a visible, albeit holstered firearm, told the taxi driver that the Defendant was not free to leave with her. This directive was the functional equivalent of Agent Ross giving the Defendant the same command. The court must determine whether this transformed a consensual encounter

10

into a "seizure" subject to Fourth Amendment scrutiny.

"The test provided by the Supreme Court for determining what constitutes a 'seizure' under the fourth amendment, and the point in time when any seizure occurs, is whether 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Adegbite*, 846 F.2d 834, 837 (2d Cir. 1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "Factors which strongly suggest such is the case are, for example, the display of a weapon, physical touching of the person by the officer and language or tone indicating a show of authority that may compel compliance with the officer's request." *United States v. Sugrim*, 732 F.2d 25, 28 (2d Cir. 1984) (citations omitted).

Here, although no physical force or restraint was used, Agent Ross was actively interfering with the Defendant's planned departure from the Store. *See Pinto-Montoya*, 540 F.3d at 132 ("[A]n assertion of authority to restrain a person's freedom of movement by law enforcement officers would, in most instances, constitute a seizure."); *United States v. Galindo-Hernandez*, 674 F.Supp. 979, 983 (E.D.N.Y. 1987) ("blocking an individual's path or otherwise physically impeding his progress is a 'consideration of great and probably decisive significance,' because this action implicitly restrains liberty.") (quotation omitted). Moreover, at the time of the taxi cab's arrival, Agent Ross maintained possession of the Defendant's driver's license which was presumably the Defendant's sole form of identification. *See Glover*, 957 F.2d at 1008 (retention of person's identification is a factor that weighs in favor of finding a seizure); *Tehrani*, 826 F.Supp. at 798-99 (factors that support conclusion that a reasonable person would not feel free to leave include "prolonged retention of a person's identification cards or other personal effects."). The court therefore concludes that the Defendant was "seized" when Agent Ross instructed the taxi driver, in the Defendant's presence, that Defendant was not free to leave. The court must next determine whether this detention was constitutionally permissible.

Agent Ross's detention of the Defendant at the Store was lawful if Agent Ross had "a reasonable, articulable suspicion that [the Defendant] *has been*, or is about to be engaged in criminal activity." *United States v. Hensley*, 469 U.S. 221, 227 (1985) (quoting *United States v. Place*, 462 U.S. 696, 702 (1983) (emphasis supplied in *Hensley*)). "Although the concept of reasonable suspicion to make an investigative stop is not susceptible to precise definition, the requisite level of suspicion . . . is 'considerably less than proof of wrongdoing by a preponderance of the evidence.'" *Glover*, 957 F.2d at 1009 (citations omitted).

In examining whether Agent Ross had a reasonable, articulable suspicion of criminal activity, the court must not "indulge in unrealistic second-guessing" as to the means law enforcement officers employ to conduct their investigations. *United States v. Sharpe*, 470 U.S. 675, 686 (1985). "The question is not simply whether some . . . alternative [method] was available, but whether the police acted unreasonably in failing to recognize or pursue it." *Id.* at 687. Although the "reasonable, articulable suspicion of criminal activity" standard is an objective one, the court must determine whether "the conduct would appear suspect to one familiar with the practices of [persons illegally crossing the border], albeit the pattern of behavior is innocuous to the untrained observer." *Glover*, 957 F.2d at 1010 (quoting *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991)).

In this case, Agent Ross responded to a concerned citizen's report of a "suspicious" person with camouflage pants, a wide brim hat, and a backpack trying to call a taxi. The individual was described as having an accent and a dark complexion, possibly South American. Although the information provided was not particularly telling, it was derived from a disinterested source. *See United States v. Elmore*, 482 F.3d 172, 180 (2d Cir. 2007) ("The veracity of identified private citizen informants (as opposed to paid or professional criminal informants) is generally presumed in the absence of special circumstances suggesting that they should not be trusted."); *United States v. Rollins*, 522

F.2d 160, 164 (2d Cir. 1975) (noting the "peculiar likelihood of accuracy" of a citizen informant's report).

The Store is approximately two miles from the United States-Canada border in a location where persons illegally entering the United States have been previously apprehended. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975) ("Officers may consider the characteristics of the area in which they encounter [an individual]. Its proximity to the border . . . and previous experience with alien traffic are all relevant [as well as] information about recent illegal border crossings in the area"); *Sugrim*, 732 F.2d at 30 (proximity to the border, location where illegal aliens entering the country are known to congregate, suspect's mode of dress, and officer's experience in detecting illegal entry may support a reasonable and articulable suspicion of illegal entry).

When Agent Ross arrived at the Store, he discovered the Defendant who fit the description in the citizen's report and who was identified by that citizen. Agent Ross questioned the Defendant who said he had been camping. Finding the Defendant's clothing muddier than he believed consistent with this activity, Agent Ross suspected that the Defendant may have walked through the woods to illegally cross the border.

The Defendant advised he was born in Hungary and claimed to be a naturalized United States citizen. He produced a California driver's license, but was unable or unwilling to produce naturalization papers or any evidence regarding how, when, and where he was naturalized. This was unusual in Agent Ross's experience as naturalization is a lengthy and time-consuming process and not generally an event that an individual would forget. *See Terry v. Ohio*, 392 U.S. 1, 27 (1968) ("[I]n determining whether the officer acted reasonably . . . , due weight must be given . . . to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."); *United States v. Avalos-Ochoa*, 557 F.2d 1299, 1301-02 (9th Cir. 1977) ("Among the facts which an officer can consider in formulating such reasonable suspicion are . . . the officer's experience in detecting illegal entry and smuggling."). The Defendant did not have his

own transportation and was awaiting a taxi to take him elsewhere. Agent Ross suspected that the Defendant had recently entered the United States illegally. This suspicion was both reasonable and based upon articulable facts: proximity to the border; the Store's location in an illegal border crossing area; use of the Store's telephone in the past by illegal aliens; the Defendant's foreign birth; his muddied appearance; the lack of transportation for a purported California resident; the Defendant's lack of apparent ties to Vermont; the absence of naturalization papers; and the Defendant's unwillingness or inability to answer questions regarding how, when, and where he came to be naturalized.[4]

Although at this juncture, there was not a preponderance of evidence that the Defendant had committed a crime, the facts created a reasonable suspicion that the Defendant may be an illegal alien who had just entered the country other than at a port of entry. The totality of the circumstances thus supports the conclusion that Agent Ross's initial detention of the Defendant at the Store was a lawful investigatory stop. *See Terry*, 392 U.S. at 27-31.

The Defendant contends that even if his initial detention is deemed lawful, the detention lasted longer than necessary to effectuate the purpose of the stop. He asserts that once he provided a U.S. driver's license, he should have been free to leave. The court disagrees. Agent Ross was not compelled to accept the Defendant's driver's license as proof of citizenship and was entitled to briefly detain the Defendant to confirm whether the Defendant's claim that he was a naturalized citizen was accurate. *See Marquez v. Kiley*, 436 F.Supp. 100, 108 (S.D.N.Y. 1977) (where immigration officers

---

[4] Although "a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure," *Bostick*, 501 U.S. at 437, here the Defendant's refusal to provide details regarding his naturalization followed his statement that he was a naturalized citizen. Having made such a claim, it was reasonable to expect him to provide some evidence to corroborate it. The court places no weight on Agent Ross's further suspicion that the Defendant's calm demeanor suggested he had prior encounters with law enforcement, as it is equally consistent with absence of guilt.

reasonably suspected individual's claim to be a legal resident alien notwithstanding her green card, "they were entitled briefly to detain her while they verified her claim by radio contact with INS headquarters."). Agent Ross did so by asking the Defendant if he was willing to step back inside the Store so that Agent Ross could make a phone call. The Defendant followed Agent Ross into the Store and waited near the entrance of the Store while Agent Ross obtained information indicating that the Defendant had been previously deported and had an extensive criminal record. This further detention of the Defendant lasted a matter of minutes in an encounter at the Store that lasted approximately twenty-one minutes. *See Glover*, 957 F.2d at 1011 ("A critical factor in evaluating the intrusiveness of a stop is the length of the detention."). The period of time involved was no longer than necessary to diligently pursue the objective of the stop which was to determine whether the Defendant had committed an immigration violation and/or had entered the country illegally after removal. *Id.* at 1013 (collecting cases where detentions of seventy minutes or less were deemed "reasonable"). Moreover, by placing a quick telephone call, Agent Ross "diligently pursued a means of investigation that was likely to confirm or dispel [his] suspicions quickly. . ." *Sharpe*, 470 U.S. at 686.

The court concludes that the initial detention of the Defendant at the Store was "reasonably related in scope and duration to the circumstances that justified the stop in the first instance, so as to be minimally intrusive of the [Defendant's] Fourth Amendment interests." *Glover*, 957 F.2d at 1011.

C. *Whether There was Probable Cause to Arrest the Defendant.*

"[A]n arrest [is] plainly a Fourth Amendment 'seizure'--that must be based on probable cause." *Id.* at 1008. The Government contends that Agent Ross's administrative arrest of the Defendant was civil in nature[5] (Doc. 21 at 8) but, in this case,

---

[5] Border patrol agents are authorized to effectuate criminal as well as civil arrests. *See* 8 C.F.R. § 287.5(c)(2) (criminal arrest for felonies involving the admission or removal of aliens); 8 C.F.R. § 287.5(c)(1) (civil arrest for immigration violations); 8 C.F.R. § 287.5(c)(3) & (4)

15

that is a distinction without a difference. "Administrative arrests must be supported by probable cause to withstand constitutional scrutiny." *Tehrani*, 826 F.Supp. at 802 (citing *Galindo-Hernandez*, 674 F.Supp. at 985.

Probable cause to arrest exists when the facts and circumstances are sufficient to warrant a prudent person's belief that a crime has been committed and that the person arrested committed it. *See Beck v. Ohio,* 379 U.S. 89, 91 (1964). Here, Agent Ross's arrest of the Defendant was supported by trustworthy evidence that the Defendant had entered and was present in the United States after being deported, without the permission of the U.S. Attorney General to re-enter. In addition, Agent Ross knew that the Defendant had an extensive criminal record in this country. Moreover, as a taxi had recently arrived to take the Defendant to an unknown destination, Agent Ross had reason to believe the Defendant was likely to escape before a warrant could be obtained for his arrest. *See* 8 U.S.C. § 1357. Accordingly, the court finds that the Defendant's arrest was supported by probable cause and complied with statutory requirements for a warrantless arrest. *See Contreras v. United States*, 672 F.2d 307, 309 (2d Cir. 1982); *Ojeda-Vinales v. INS*, 523 F.2d 286, 288 (2d Cir. 1975).

D. *Whether the Defendant was Subjected to Custodial Interrogation Without Miranda Warnings.*

Agent McVey transported the Defendant to the Richford station in handcuffs and did not question him en route. Upon their arrival at the station, the Defendant was processed and was asked questions about his identity and biographical facts, and his fingerprints were obtained. This took place prior to the Defendant's receipt of *Miranda* warnings. "[T]he solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by *Miranda v. Arizona*, 384 U.S. 436 (1966), whether that solicitation occurs before or after *Miranda* warnings

---

(criminal arrest for any felonies or crimes against the United States).

are given." *Adegbite*, 846 F.2d at 838 (citing *United States ex. rel. Hines v. LaValle*, 521 F.2d 1109, 1112-12 (2d Cir. 1975) and *United States v. Gotchis*, 803 F.2d 74, 78-79 (2d Cir. 1986)). The Defendant's rights were thus not violated when, after a lawful arrest, he was asked standard "booking" questions and was required to submit his fingerprints without the benefit of *Miranda* warnings.

E. *Whether the Defendant Validly Waived his Miranda Rights*.

There is no dispute that the Defendant was in custody at the time he was interviewed at the Richford station. The Defendant, who did not testify, asserts that he did not validly waive his *Miranda* rights prior to custodial interrogation. (Doc. 18 at 7). The evidence before the court compels a contrary conclusion.

Agent Ross advised the Defendant of his *Miranda* warnings and obtained a valid waiver from the Defendant who agreed to answer questions without an attorney present. Thereafter, Agent McVey reminded the Defendant of his *Miranda* rights and obtained confirmation of his waiver. This was constitutionally sufficient. *See United States v. Castro-Tirado*, 407 F.Supp. 210, 212 (E.D.N.Y. 1976) ("[T]here is no question that after hearing his *Miranda* warnings given more than once [the defendant] spoke voluntarily without any violation of his constitutional rights."). Accordingly, it matters not whether the Defendant was wearing his eyeglasses when he signed the waiver form. *See United States v. Guay*, 108 F.3d 545 (4th Cir. 1997) (valid waiver of *Miranda* rights found notwithstanding the fact that defendant did not have his glasses with him and there was a language barrier. Rights were read to the defendant in English and he responded in English that he understood them.); *United States v. Reddrick*, 90 F.3d 1276 (7th Cir. 1996) (defendant's claim that he did not have his eyeglasses and thus could not read waiver form or his subsequent typewritten statement deemed insufficient to invalidate his waiver which was given after detectives' oral reading of his *Miranda* rights).

The Defendant advised that he had entered the country approximately three months prior through the San Ysidro, California port of entry. When Agent McVey confronted the

Defendant with the fact that he was in custody at the time, the Defendant terminated the interview. This underscores the conclusion that the Defendant provided information on a voluntary basis and knew that he could terminate the interview at any time. *See United States v. Andaverde*, 64 F.3d 1305, 1314 (9th Cir. 1995) ("[T]he fact that [defendant] later in interview expressly invoked his right to silence demonstrates that he was conscious of his right to remain silent, and that he was cognizable of the need to do so."); *United States v. Edwards*, 563 F.Supp.2d 977, 1002 (D.Minn. 2008) ("[T]his Court finds that the waiver made by defendant was knowing and intelligent based on the fact that defendant was able to request that the interview be terminated when he no longer wanted to answer questions."). Accordingly, there is no evidence before the court that the Defendant made incriminating statements in the absence of a valid *Miranda* waiver.

Having determined that every aspect of the border patrol's encounter with the Defendant was permissible under the Fourth Amendment and having further found that the Defendant's *Miranda* rights were not violated, Defendant Peter Kisgorgy's Motion to Suppress is hereby DENIED.[6] The Defendant's Motion for Return of Property is DENIED at this time.

SO ORDERED.

Dated at Burlington, in the District of Vermont this 23rd day of April, 2010.

Hon. Christina Reiss
United States District Court Judge

---

[6] In light of this ruling, the court need not and thus does not address the Government's argument that the Defendant has no constitutionally protected property interest in his A-file.